IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

MARSHALL DIVISION

| | | |
|---|---|---|
| MAXMA, ET AL. | § | |
| Vs. | § | CIVIL ACTION NO. 2:03-CV-421 |
| CONOCOPHILLIPS INC. | § | |

## MEMORANDUM OPINION AND ORDER

The court issues this memorandum opinion and order to resolve the parties' claim construction disputes.

### 1.    Introduction.

In this case, the plaintiffs, Maxma, L.C. and J. Kenneth Sanders, have sued the defendant, ConocoPhillips, Inc., for infringement of United States Patent No. 5,266,082 ("the '082 patent"), entitled "Fuel Additive."  The plaintiffs have also appended state law tort claims arising out of a failed business venture between the parties.  The parties filed claim construction briefs and supplements, and the court held a hearing.  After considering the parties' submissions, the arguments of counsel, and the pertinent portions of the record, the court is of the opinion that the claims of the '082 patent should be construed as set forth in this opinion.

### 2.    Legal Principles Relevant to Claim Construction

"A claim in a patent provides the metes and bounds of the right which the patent confers on the patentee to exclude others from making, using or selling the protected invention." *Burke, Inc. v. Bruno Indep. Living Aids, Inc.*, 183 F.3d 1334, 1340 (Fed. Cir. 1999).  Claim construction is an issue

of law for the court to decide. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970-71 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996).

To ascertain the meaning of claims, the court looks to three primary sources: the claims, the specification, and the prosecution history.  *Markman*, 52 F.3d at 979.  Under the patent law, the specification must contain a written description of the invention that enables one of ordinary skill in the art to make and use the invention.  A patent's claims must be read in view of the specification, of which they are a part.  *Id.*  For claim construction purposes, the description may act as a sort of dictionary, which explains the invention and may define terms used in the claims.  *Id.*  "One purpose for examining the specification is to determine if the patentee has limited the scope of the claims." *Watts v. XL Sys., Inc.*, 232 F.3d 877, 882 (Fed. Cir. 2000).

Nonetheless, it is the function of the claims, not the specification, to set forth the limits of the patentee's claims.  Otherwise, there would be no need for claims. *SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985) (en banc).  The patentee is free to be his own lexicographer, but any special definition given to a word must be clearly set forth in the specification. *Intellicall, Inc. v. Phonometrics*, 952 F.2d 1384, 1388 (Fed. Cir. 1992).  And, although the specification may indicate that certain embodiments are preferred, particular embodiments appearing in the specification will not be read into the claims when the claim language is broader than the embodiments. *Electro Med. Sys., S.A. v. Cooper Life Sciences, Inc.*, 34 F.3d 1048, 1054 (Fed. Cir. 1994).

This court's claim construction decision must be informed by the Federal Circuit's recent decision in *Phillips v. AWH Corporation*, 2005 WL 1620331 (Fed. Cir. July 12, 2005)(en banc).  In *Phillips*, the court set forth several guideposts that courts should follow when construing claims.  In

particular, the court reiterated that "the *claims* of a patent define the invention to which the patentee is entitled the right to exclude."  2005 WL 1620331 at *4 (emphasis added)(*quoting Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)).  To that end, the words used in a claim are generally given their ordinary and customary meaning.  *Id.* at *5. The ordinary and customary meaning of a claim term "is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e. as of the effective filing date of the patent application."  *Id.*  This principle of patent law flows naturally from the recognition that inventors are usually persons who are skilled in the field of the invention.  The patent is addressed to and intended to be read by others skilled in the particular art.  *Id.*

The primacy of claim terms notwithstanding, *Phillips* made clear that "the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.*  Although the claims themselves may provide guidance as to the meaning of particular terms, those terms are part of "a fully integrated written instrument."  *Id.* at **6-7 (*quoting Markman*, 52 F.3d at 978).  Thus, the *Phillips* court emphasized the specification as being the primary basis for construing the claims. *Id.* at **7-8.  As the Supreme Court stated long ago, "in case of doubt or ambiguity it is proper in all cases to refer back to the descriptive portions of the specification to aid in solving the doubt or in ascertaining the true intent and meaning of the language employed in the claims." *Bates v. Coe*, 98 U.S. 31, 38 (1878).  In addressing the role of the specification, the *Phillips* court quoted with approval its earlier observations from *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998):

Ultimately, the interpretation to be given a term can only be determined and

confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim. The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction.

Consequently, *Phillips* emphasized the important role the specification plays in the claim construction process.

The prosecution history also continues to play an important role in claim interpretation. The prosecution history helps to demonstrate how the inventor and the PTO understood the patent. *Phillips*, 2005 WL 1620331 at *9. Because the file history, however, "represents an ongoing negotiation between the PTO and the applicant," it may lack the clarity of the specification and thus be less useful in claim construction proceedings. *Id.* Nevertheless, the prosecution history is intrinsic evidence. That evidence is relevant to the determination of how the inventor understood the invention and whether the inventor limited the invention during prosecution by narrowing the scope of the claims.

*Phillips* rejected any claim construction approach that sacrificed the intrinsic record in favor of extrinsic evidence, such as dictionary definitions or expert testimony. The *en banc* court condemned the suggestion made by *Texas Digital Systems, Inc. v. Telegenix, Inc.*, 308 F.3d 1193 (Fed. Cir. 2002), that a court should discern the ordinary meaning of the claim terms (through dictionaries or otherwise) before resorting to the specification for certain limited purposes. *Id.* at **13-14. The approach suggested by *Texas Digital*–the assignment of a limited role to the specification–was rejected as inconsistent with decisions holding the specification to be the best guide to the meaning of a disputed term. *Id.* According to *Phillips*, reliance on dictionary definitions at the expense of the specification had the effect of "focus[ing] the inquiry on the abstract meaning

of words rather than on the meaning of the claim terms within the context of the patent." *Id*. at *14. *Phillips* emphasized that the patent system is based on the proposition that the claims cover only the invented subject matter. *Id*. What is described in the claims flows from the statutory requirement imposed on the patentee to describe and particularly claim what he or she has invented. *Id*. The definitions found in dictionaries, however, often flow from the editors' objective of assembling all of the possible definitions for a word. *Id*.

*Phillips* does not preclude all uses of dictionaries in claim construction proceedings. Instead, the court assigned dictionaries a role subordinate to the intrinsic record. In doing so, the court emphasized that claim construction issues are not resolved by any magic formula. The court did not impose any particular sequence of steps for a court to follow when it considers disputed claim language. *Id*. at *16. Rather, *Phillips* held that a court must attach the appropriate weight to the intrinsic sources offered in support of a proposed claim construction, bearing in mind the general rule that the claims measure the scope of the patent grant. The court now turns to a discussion of the patent in suit and the disputed claim terms.

**3.   Discussion.**

The '082 patent is entitled "Fuel Additive." The patent claims compositions and methods for improving the combustion efficiency of internal combustion engines. '082 patent, Abstract; col. 1, ll. 5-10. In the Abstract, the patent states that the composition is composed of a bicyclic aromatic component, zinc oxide, and at least one Group 8-11 metal oxide, all dispersed in a carrier liquid. In the Background of the Invention, the patent observes that the hydrocarbon content of vehicle emissions is indicative of the fuel burning efficiency of the engine. '082 patent, col. 1, ll. 29-30. Ideally, motor vehicle exhaust emissions contain low percentages of hydrocarbons, carbon monoxide

and molecular oxygen, and a high percentage of carbon dioxide. '082 patent, col. 1, ll. 44-47.

In the Summary of the Invention, the patent states that "[t]he present invention is directed to fuel additive compositions and processes for improving combustion and substantially reducing hydrocarbon (HC), carbon monoxide (CO), and molecular oxygen ($O_2$) motor vehicle exhaust emissions." '082 patent, col. 2, ll. 57-61. According to the summary, the fuel additive composition comprises:

> (1) at least 90% of a carrier liquid selected from the group consisting of a hydrocarbon fraction in the kerosene boiling range having a flash point of at least 100º F. and an auto-ignition temperature of at least 400º F., a $C_1$-$C_3$ monohydric, dihydric, or polyhydric aliphatic alcohol, and mixtures thereof, (2) a bicyclic aromatic component selected from the group consisting of naphthalene, substituted naphthalene, biphenyl, biphenyl derivatives, and mixtures thereof, (3) zinc oxide, and (4) at least one Group 8-11 metal oxide selected from the group consisting of iron oxide, copper oxide, cobalt oxide, ruthenium oxide, osmium oxide, and palladium oxide, present in an amount less than the amount of zinc oxide.

'082 patent, col. 2, l. 61-col. 3, l. 7. In addition to this description, the Summary of the Invention sets forth several different embodiments of the composition. The embodiments incorporate different ratios of the ingredients into the composition. *See* '082 patent, col. 3, ll. 9-49.

The specification also states that the invention is directed to processes for formulating a fuel blend for use in an internal combustion engine. '082 patent, col. 3, ll. 50-52. The patent describes the process of providing a hydrocarbon-containing fuel for the internal combustion engine and adding to that hydrocarbon-containing fuel a fuel extending additive comprised of the bicyclic aromatic component, zinc-oxide, and at least one Group 8-11 metal oxide selected from the group listed above, present in an amount less than the amount of zinc oxide. '082 patent, col. 3, ll. 52-62. The patent describes variations of this process, depending on amount of additive combined with the fuel and the inclusion of additional ingredients, such as magnesium oxide. '082 patent, col. 3, l. 62-

6

col. 4, l. 17.

Finally, the patent provides that "the hydrocarbon-containing fuel and fuel extending additive can be supplied to the fuel chamber either separately or together as a mixture," and the patent therefore claims processes used in the operation of an internal combustion engine having an associated fuel chamber which supples fuel to the engine and an exhaust system for the emission of combustion products.  '082 patent, col. 4, ll. 18-23, col. 7, ll. 46-48.  The Detailed Description of the Preferred Embodiment describes in greater particularity the various embodiments of the invention.  In addition, this description discloses the results of twelve tests conducted using various embodiments of the invention.

In their briefing and during the claim construction hearing, the parties focused their presentations on claim 1 of the '082 patent.  Claim 1 provides:

In a fuel additive for a hydrocarbon fuel, the composition comprising:

a)      at least 90 wt. % of a carrier liquid selected from the group consisting of a hydrocarbon fraction in the kerosene boiling range having a flash point of at least $100°$ F. and an auto-ignition temperature of at least $400°$ F., a $C_1$-$C_3$ monohydric, dihydric, or polyhydric aliphatic alcohol, and mixtures thereof;

b)      a bicyclic aromatic component selected from the group consisting of naphthalene, substituted naphthalene, biphenyl, biphenyl derivatives, and mixtures thereof;

c)      zinc oxide;

d)      at least one Group 8-11 metal oxide selected from the group consisting of iron oxide, copper oxide, cobalt oxide, ruthenium oxide, osmium oxide, and palladium oxide, present in an amount less than the amount of zinc oxide.

The parties have several disputes concerning the meaning of the terms used in claim 1.  The court now turns to the task of addressing those disputes.

**A.     Preamble as a limitation.**

Although the term "fuel additive," or "fuel extending additive" appears in the body of several claims of the '082 patent, *e.g.*, claim 29, it does not appear in the body of claim 1.  The defendant contends that the preamble of claim 1 acts as a limitation, requiring the court to impose the "fuel additive" limitation into the claim.  This argument is inspired by a non-infringement position–that the *use* of the claimed composition must be limited to its use as an "additive" rather than in the process of refining the hydrocarbon fuel.  This argument, however, misstates the role of the court when it construes claims.  Accordingly, the court will state directly what will be implicit from the remainder of this opinion:  courts construe claims without regard to the device or structure accused of infringement.  *Jurgens v. McKasy*, 927 F.2d 1552, 1560 (Fed. Cir. 1991).  Nothing in this order should be construed as expressing any opinion on infringement.

"Preambles describing the use of an invention generally do not limit the claim because the patentability of apparatus or composition claims depends on the claimed structure, not on the use or purpose of that structure." *Catalina Marketing Intern., Inc. v. Coolsavings.com, Inc.*, 298 F.3d 801, 809 (Fed. Cir. 2002); *Union Oil Company of California v. Atlantic Richfield Co.*, 208 F.3d 989, 995 (Fed. Cir. 2000).  Although there are some exceptions to this rule, none applies in this case.  Claim 1 describes a structurally complete composition, and the description provided in the preamble of the use to which the composition to be put (i.e. "*in a fuel additive* for a hydrocarbon fuel")(emphasis added) does not operate as a claim limitation.  None of the claim limitations relies on the preamble for antecedent support, and the court is not persuaded to impose the preamble limitation of a "fuel additive" into the body of claim 1.

8

**B.     Markush groups.**

The court now turns to the disputes surrounding the Markush groups found in claim 1 of the

'082 patent.  Three of the limitations of claim 1 include Markush groups.  A Markush group is a

listing of specified alternatives of a group in a patent claim, typically expressed in the form: a

member selected from the group consisting of A, B, and C.  *Abbott Laboratories v. Baxter*

*Pharmaceutical Products, Inc.*, 334 F.3d 1274, 1280 (Fed. Cir. 2003).  A Markush group is a type

of generic expression covering a group of two or more different materials.  The members of a

Markush group are alternatively usable for the purposes of the invention.  *In re Driscoll*, 562 F.2d

1245, 1249 (C.C.P.A. 1977).  Proper claim drafting requires the Markush group to be closed;

therefore, the group must be characterized with the transitional phrase "consisting of" rather than

"comprising" or "including."  *Abbott Laboratories*, 334 F.3d at 1280-1281.

This claim drafting style does not mean that the entire claim is closed.  In this case, the

preamble uses the transitional phrase "comprising," and is presumptively open-ended.  That is, the

presence of the recited composition will infringe the claim, even if other structures or ingredients

are also present.  To illustrate, claim 1(a) requires the presence of a carrier liquid selected from the

group consisting of a hydrocarbon fraction in the kerosene boiling range having a flash point of at

least100º F. and an auto-ignition temperature of at least 400º F., a $C_1$-$C_3$ monohydric, dihydric, or

polyhydric aliphatic alcohol, and mixtures thereof.  The presence of any of these alternatives, in the

required amount, satisfies the claim limitation, even if the accused composition contains additional

materials not recited elsewhere in the body of the claim.

The defendant maintains, however, that the use of the Markush group closes the carrier liquid

limitation (as well as any other limitation using a Markush group).  That is, the defendant contends

that to satisfy the carrier liquid limitation, any accused composition may include only one of the recited carrier fluids.  Under this view, the presence of some unlisted ingredient in the accused product that otherwise meets the court's definition of a carrier liquid would defeat infringement. This argument is ultimately inconsistent with well-settled law governing the construction of open-ended claims.  The court rejects it.

Properly viewed, the transitional phrase "consisting of" closes the *group of alternatives*, not the claim.  Therefore, to prove infringement, the plaintiffs must prove the presence of one of the members of the group to satisfy the limitation.  What the plaintiffs may not do to discharge their burden is to establish the presence of a substance meeting the court's definition of "carrier liquid" that is not within the group of listed alternatives.

*Abbott Laboratories* is not to the contrary.  The Markush group in that case required the presence of an "amount effective" of a Lewis acid inhibitor selected from a group.[1] *Abbott Laboratories*, 334 F.3d at 1276.  The patentee attempted to prove infringement by combining two Lewis acid inhibitors to prove that the combination of those substances in the accused product was an "amount effective."  *Id.* at 1282-1283.  The Federal Circuit noted, however, that the Markush group at issue did not permit mixtures of the individual members of the group.  *Id.* at 1283. Therefore, the court concluded that the patentee, to prove literal infringement, would need to show that only one member of the group was present in an "amount effective" to meet the claim limitation. Id. at 1282.  "Thus, the plain meaning of asserted claims 1 and 6 limits them to a single Lewis acid

---

[1]     At issue in that case was a patent which claimed compositions and methods of preventing the degradation of sevoflurane anesthetic by adding an effective amount of certain specific Lewis acid inhibitors.  Lewis acids attack sevoflurane at certain linkages and cause the release of hydrofluoric acid into the anesthetic.  Hydrofluoric acid corrodes skin and mucous membranes and its presence in anesthetics is therefore harmful.

inhibitor selected from the recited Markush group, and present in an amount effective to prevent degradation of sevoflurane by Lewis acids." *Id.* at 1281. *Abbott Laboratories* did not hold that the presence of *any* Lewis acid inhibitor, together with an "amount effective" of a listed Lewis acid inhibitor, would defeat a claim of literal infringement. For these reasons, the court rejects the defendant's proposed constructions of the Markush group limitations set forth in claim 1 of the '082 patent.[2]

## C.      Carrier liquid/90% weight limitation.

The court now turns to the construction of the carrier liquid limitation, followed by a construction of the 90 wt. % limitation. Claim 1 requires the presence in the composition of "90 wt. %" of a carrier liquid selected from a Markush group. The plaintiff contends that "carrier liquid" means "a liquid to which an active ingredient or agent is added as a way of applying, transferring, or bringing into close proximity the ingredient or agent so that reaction can occur." The defendant contends that the term "carrier liquid" means "a liquid into which the bicyclic aromatic and inorganic metal oxide components are dispersed for transport to the hydrocarbon fuel."

The claim language, read in light of the specification, resolves these issues. The language "carrier liquid" suggests a liquid or fluid which carries or transports active ingredients. The specification explains: "[t]he metal oxides and the bicyclic aromatic compound(s) in the composition of the present invention *are dispersed* in a carrier liquid, such that *the composition is comprised at least 90% by weight* of a carrier liquid selected from" the Markush group. '082 patent,

---

[2]      The court has considered the parties' letter submissions relating to *Gillette v. Energizer Holdings, Inc.*, 405 F.3d 1367, 1372 (Fed. Cir. 2005). That case did not address a Markush group claim, even considering the alternative drafting language ("group consisting of") suggested by the court. The decision is therefore off the mark.

col. 6, ll. 7-11 (emphasis added).  This language suggests that a carrier liquid is a liquid into which the active ingredients or agents are dispersed as a way of transferring (or "carrying") those ingredients so that the intended reaction can occur.  Although the plaintiff appears to object to the use of the term "dispersed," the court is considering the term "carrier liquid" in the context of the claim language as well as the specification.  The cited passage of the specification emphasizes the function performed by the "carrier liquid."  In this patent, the carrier liquid transports or carries (i.e. by having dispersed therein), certain active ingredients.  The court therefore defines "carrier liquid" as "a liquid into which the active ingredients or agents are dispersed as a way of transferring those ingredients or agents so that the intended reaction can occur."

In addition, the parties dispute the calculation of the 90 wt. % limitation.  The plaintiff contends that the 90 wt. % limitation applies to the total weight of the combination of the carrier liquid, the bicyclic aromatic component, the zinc oxide, and the group 8-11 metal oxide.  The defendant contends that the 90 wt. % limitation applies to the entire composition accused of infringement, inclusive of both listed and any unlisted ingredients.  The passage cited from the specification also informs the court's decision on this issue.  The claim language, supported by the cited portion of the specification, states that the 90 wt. % limitation refers to the amount of  the carrier liquid selected from the Markush group when combined with the listed ingredients of the claim.  The specification refers to the combination of the metal oxides and the bicyclic aromatic being dispersed in the carrier liquid such that the claimed composition (*i.e.* the total of the carrier liquid and the listed limitations) is comprised at least 90% by weight of a carrier liquid.  Accordingly, the court adopts the plaintiff's proposed construction of the 90 wt. % limitation.

### D.     Fuel additive.

The court now turns to the proper definition of "fuel additive."  The plaintiff proposes that "fuel additive" or "additive" means "a material added to another, usually in small amounts, to impart or enhance desirable properties or to suppress undesirable properties."  For support, the plaintiff points to the Standard Terminology Relating to Petroleum, Petroleum Products, and Lubricants published by the American Society for Testing and Materials.  The defendant contends that the term means "[a] pre-formulated composition, other than one composed solely of carbon and/or hydrogen, that is intentionally added to a fuel and is not intentionally removed prior to sale or use."  The defendant's definition has its roots in the EPA's definition of additive found at 40 C.F.R. § 79.2(e).  In addition, the defendant points to the prosecution history and argues that the term "additive" must be limited, in this case, to a "pre-formulated" composition.

There is authority for the proposition that definitions issued by regulatory agencies carry weight in claim construction proceedings if they are probative of an industry-specific meaning for a disputed claim term.  *Mars, Inc. v. H.J. Heinz Co., L.P.,* 377 F.3d 1369, 1374 n.3 (Fed. Cir. 2004) (*citing E-Pass Techs., Inc. v. 3Com Corp.*, 343 F.3d 1364, 1368 (Fed. Cir. 2003)).  Nonetheless, the application of a regulatory definition depends on whether it accurately reflects the industry's understanding of the term.  In this case, the defendant has not shown that the EPA's definition was the definition of "additive" accepted by the industry when the regulation was promulgated.  The court is reluctant to adopt the EPA's definition of this term because the court is concerned that the definition is the result of policy-making by the EPA as opposed to a codification of an industry-accepted definition.  Consequently, the court rejects the regulatory definition of additive in this case.

The court has also considered the defendant's request to incorporate the term "pre-

13

formulated" into the definition of additive.  The defendant relies on the prosecution history to urge this limitation.  During the prosecution of the '082 patent, the examiner rejected the application as obvious over the combination of the UK and Arkis references.  The UK patent disclosed a fuel additive which included zinc oxide, iron oxide, and copper oxide.  The Arkis reference also disclosed an additive composition, which the applicant argued comprised about 10% to 90% of an aliphatic alcohol and about 10% of an aromatic solvent.  Although neither reference disclosed all of the limitations of the plaintiff's invention, the examiner relied on a passage in Arkis to support an obviousness rejection and urged that one of skill in the art would have been motivated to combine the two references.  Specifically, the examiner stated:

> it would have been obvious to the artisan skilled in the art to add the additive composition of UK to the fuel composition of Arkis et al because Arkis et al teach the addition of conventional additives to the composition.

The patentee disagreed with the examiner and argued that Arkis did not teach the combination of the two additives, but rather taught the introduction of the additive to a fuel containing antiknock agents, etc..  The patentee's statement was not an admission that the composition of the patent had to be pre-formulated before its introduction into a hydrocarbon fuel.  Rather, the applicant was objecting to the examiner's characterization of Arkis as providing a motive to combine.  Nothing in the prosecution history requires the inclusion of the "pre-formulated" limitation sought by the defendant.  The court therefore rejects it.

Based on these holdings, the court defines "fuel additive" consistent with the plaintiff's definition of "additive" except that the court has included the term "fuel" within the definition of "additive" to provide context.  "Fuel additive" means "a material added to fuel, usually in small amounts, to impart or enhance desirable properties or to suppress undesirable properties."

14

**E.     Hydrocarbon fuel.**

Next, the court turns to the definition of "hydrocarbon fuel."  The term "hydrocarbon fuel" appears only in the preamble of asserted claim 1.  Nonetheless, the term is used consistently with the term "hydrocarbon-containing fuel" found elsewhere in the patent.  *See* '082 patent, claim 29. Although the court has previously held that the preamble of claim 1 is not a limitation, the court will construe the terms "hydrocarbon fuel" and "hydrocarbon-containing fuel" consistently to provide guidance.

The plaintiff contends that the term means "a material that contains hydrocarbon and is capable of releasing energy or power by combustion."  The defendant contends that the term means "a composition, such as gasoline or diesel fuel, capable of releasing energy or power by combustion or other chemical or physical reaction that is composed of organic compounds that contain only carbon and hydrogen and is not just one or more components of such composition that can be separated by further processing."  The court has considered the arguments of the parties and is persuaded that the plaintiff's definition is correct. The defendant's proposed definition of this simple claim term is wrought with non-infringement arguments that are not properly the subject of claim construction.  The court defines "hydrocarbon fuel" and "hydrocarbon-containing fuel" to mean "a material that contains hydrocarbon and is capable of releasing energy or power by combustion."

**F.     Sulphur neutralization and removal.**

The defendant contends in its Second Supplemental Markman Brief that the '082 patent "cannot be interpreted to include the use of the metal oxides to neutralize sulfur in gasoline at the refinery."  In particular, the defendant argues that the prior art UK patent taught the use of metal oxides to neutralize sulfur and that the applicant disclaimed any claim scope for his patent such that

it would cover the use of metal oxides to remove or neutralize sulfur.  The court rejects that argument.  The court has canvassed the prosecution history and finds no clear and explicit disavowal of claim scope for the present invention relating to sulfur neutralization or removal.  The court previously rejected any argument that the preamble limited the proposed uses of the composition.  This argument is of a similar species.  Absent a clear disclaimer, the court declines to import this limitation into the claim construction.

## G.      Invalidity arguments.

Finally, the defendant attacks several of the plaintiff's proposed constructions with the rule that claims should be construed to preserve their validity, if possible.  The defendant argues that under the plaintiff's proposed constructions, the '082 patent is invalid over either Arkis or the UK patent, or a combination of both.  *Phillips* answers this argument.  The Federal Circuit stated:

> While we have acknowledged the maxim that claims should be construed to preserve their validity, we have not applied that principle broadly, and we have certainly not endorsed a regime in which validity analysis is a regular component of claim construction.

*Phillips*, 2005 WL 1620331 at *19.  *Phillips* limited the application of the claim construction principle cited by the defendant.  The rule applies to situations in which the claim language is ambiguous after application of the available claim construction tools, and the file history is sufficiently clear to infer that the PTO would not knowingly have issued an invalid patent.  *Id.* *Phillips* counsels the court to reject the defendant's argument, presented under the rubric of an obviousness challenge, that the plaintiff's proposed constructions render the claims of the '082 patent invalid.  This is not to say that the claims are necessarily valid.  It is only to hold that the narrow situation contemplated in *Phillips* is not present in this case.

16

SIGNED this 19th day of July, 2005.

T. JOHN WARD
UNITED STATES DISTRICT JUDGE